No. 15-2086

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

FLEUR S. BRESLER, as the Co-Personal Representative of the Estate of Charles S. Bresler; SIDNEY BRESLER, Individually, as a Beneficiary of the Charles S. Bresler Irrevocable Insurance Trust; SIDNEY M. BRESLER, as the Co-Personal Representative of the Estate of Charles S. Bresler,

*Plaintiffs-Appellees*,

v.

WILMINGTON TRUST COMPANY,

*Defendant-Appellant,*

and WILMINGTON BROKERAGE SERVICES COMPANY, a/k/a Wilmington Trust Brokerage; HIGHLAND CAPITAL BROKERAGE, INC., a/k/a Highland Capital Brokerage; EDMOND IANNI; RALPH WILECZEK; MATTHEW WASCHULL; RICHARD BIBOROSCH,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(PETER J. MESSITTE, U.S. DISTRICT JUDGE)

# PETITION FOR REHEARING EN BANC
# AND, IN PART, FOR PANEL REHEARING

JAMES L. SHEA
MITCHELL Y. MIRVISS
CHRISTOPHER S. GUNDERSON
VENABLE LLP
750 EAST PRATT STREET, 9TH FLOOR
BALTIMORE, MARYLAND 21202
(410) 244-7400

DAVID T. CASE
STAVROULA E. LAMBRAKOPOULOS
K&L GATES LLP
1601 K STREET, N.W.
WASHINGTON, D.C. 20036
(202) 778-9000

ATTORNEYS FOR WILMINGTON TRUST COMPANY

## **<u>TABLE OF CONTENTS</u>**

Page

OVERVIEW ................................................................. 1

REASONS FOR GRANTING REHEARING ................................. 5

I.   The Full Court Should Decide En Banc Whether Discovery
     Abuse May Be Excused under Rule 37(c)(1) Merely Because the
     Victimized Party Had the Opportunity to Take an Eve-of-Trial
     Deposition and to Conduct Cross-Examination at Trial ...................... 5

II.  The Court Should Rehear Its Ruling that Plaintiffs Produced
     Sufficient Evidence of an Oral Agreement by Wilmington to
     Loan $5.5 Million Annually, without Requiring Collateral .................. 15

CONCLUSION .............................................................. 17

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## Cases

Artesian Water Co. v. State Dept. of Highways & Transp.,
330 A.2d 441 (Del. 1974) ............................................................... 16

In re New York, N.H, & H.R. Co.,
92 F.2d 428 (2d Cir. 1937) ........................................................... 14

N.Y. Life Ins. Co. v. Viglas,
297 U.S. 672 (1936) ...................................................................... 14

Newman v. GHS Osteopathic, Inc.,
60 F.3d 153 (3d Cir. 1995) ........................................................... 10

PAMI-LEMB I Inc. v. EMB-NHC, L.L.C.,
857 A.2d 998 (Del. Ch. 2004) ................................................... 5, 16

Radio Corp. of Am. v. Philadelphia Storage Battery Co.,
6 A.2d 329 (Del. 1939) .................................................................. 16

S. States Rack and Fixture, Inc. v. Sherwin-Williams Co.,
318 F.3d 592 (4th Cir. 2003) .............................................. 9, 10, 13

Santiago-Diaz v. Laboratorio Clinico Y de Referencia del Este,
456 F.3d 272 (1st Cir. 2006) ......................................................... 10

Saudi v. Northrop Grumman Corp.,
427 F.3d 271 (4th Cir. 2005) ........................................................ 12

Scraggs v. NGK Spark Plugs (U.S.A.), Inc.,
No. 2:15-cv-11357, 2016 WL 2952567
(S.D. W. Va. May 13, 2016) ............................................................ 9

Sommer v. Davis,
317 F.3d 686 (6th Cir. 2003) .................................................... 3, 10

Wilkins v. Montgomery,
751 F.3d 214 (4th Cir. 2014) .................................................... 2, 12

Page

## **Rules**

Fed. R. App. P. 35 ..................................................................... 1

Fed. R. App. P. 40 ..................................................................... 1

Fed. R. Civ. P. 26 ..................................................................... 1, 8, 9, 13

Fed. R. Civ. P. 26(a) ................................................................. 8

Fed. R. Civ. P. 26(a)(1)(A) ....................................................... 10

Fed. R. Civ. P. 26(a)(1)(A)(iii) ................................................. 6

Fed. R. Civ. P. 26(a)(2) ............................................................ 6

Fed. R. Civ. P. 26(a)(2)(C) ....................................................... 6

Fed. R. Civ. P. 26(a)(2)(E) ....................................................... 6

Fed. R. Civ. P. 26(b)(4)(A) ....................................................... 13

Fed. R. Civ. P. 26(e) ................................................................. 8

Fed. R. Civ. P. 37 ..................................................................... 10, 11

Fed. R. Civ. P. 37(c) ................................................................. 10

Fed. R. Civ. P. 37(c)(1) ............................................................ *passim*

## OVERVIEW

Pursuant to Fed. R. App. P. 35 & 40, Appellant-Defendant Wilmington Trust Co. ("Wilmington"), seeks rehearing en banc, or, alternatively, rehearing in part by the panel, of the Court's reported decision to address two issues of exceptional importance.

1.    The first issue addresses whether federal courts may excuse willful, protracted violations of Fed. R. Civ. P. 26's requirements for expert disclosures. Appellees-Plaintiffs Fleur Bresler, et al. ("Plaintiffs") repeatedly violated the expert-disclosure Rules—concealing their expert's damage/injury opinions until shortly before trial—and covered up their violations with misrepresentations to the district court (Messitte, J.).  Plaintiffs were not sanctioned and instead were awarded $23 million.  In this Court, a panel majority (Judge Keenan, joined by Judge Harris) ("Majority Op.") agreed that Plaintiffs had violated Rule 26 but held that the nondisclosure violations were "harmless" and do not require exclusion or a new trial under Fed. R. Civ. P. 37(c)(1).  (Majority Op. 22).

A 33-page dissenting opinion by Judge Wynn ("Dissent") thoroughly addresses the significant legal and factual problems with the majority opinion. Factually, Judge Wynn's dissent recounts how Plaintiffs got away with concealing their accounting expert's damages/injury opinion until shortly before trial; never providing an expert report explaining his complex theories; and repeatedly revising

his opinion during trial as error after error was exposed.  The expert opinion was not revealed until "*after* the deadlines for submitting expert reports and supplemental and rebuttal expert reports, *after* the close of discovery[,] *after* the court had ruled on the parties' motions for summary judgment[,]" and "*after* the deadline for filing pre-trial motions."  (Dissent 68) (emphasis in original).  Plaintiffs' excuses for their nondisclosure were clearly false and misleading.  Id. at 55-56.

Chaos ensued.  The trial judge had to cut short the expert's testimony during re-re-direct examination because the expert's testimony was so confused that neither the judge nor the jury could understand it; the judge invited the expert to leave the stand, redo his calculations over the weekend in consultation with Plaintiffs' counsel, and start anew days later—signaling to the jury that this last time, the expert got it right.  Id. at 73-74.  No report or backup data was provided showing the expert's final methodology.  Id. at 51-52.

Judge Wynn's dissent also explains in detail how, far from being "harmless" under Rule 37(c)(1), Plaintiffs' violations constituted a "miscarriage of justice" that deeply prejudiced Wilmington and disrupted the trial.  (Dissent 43, 68-75).  Indeed, prior Circuit precedent has refused to excuse "virtually identical" violations as "harmless."  Id. at 68 (discussing Wilkins v. Montgomery, 751 F.3d 214, 223 (4th Cir. 2014)).  As the dissent explains, the majority's forgiving and lenient approach conflicts with the strict standard of Rule 37(c)(1) and this Court's precedents.  Id. at

2

43.  Judge Wynn's thorough discussion provides a clear and cogent guide why en banc review is required.

Rule 37(c)(1) is a *mandatory* rule of exclusion, requiring all evidence that is not properly disclosed in discovery to be excluded as an "automatic sanction" unless the violation is "substantially justified" or "harmless."  Id. at 63 (quoting Advisory Committee notes).  The offending party, not the victimized party, has the burden of proving that its violations were harmless, yet here Wilmington was saddled with the burden of proving a prejudicial outcome.  Moreover, the "harmless" exception is extremely narrow.  Citing the Advisory Committee notes, Sixth Circuit cases hold that "harmless" means "honest mistake[s]" by the offending party, "coupled with sufficient knowledge" of the undisclosed information by the victimized party.  See, e.g., Sommer v. Davis, 317 F.3d 686, 692 (6th Cir. 2003).

As Judge Wynn meticulously documents, the misbehavior here was no "honest mistake."  The expert's faulty assumptions were concealed until the last minute, facilitated by counsel's misrepresentations.

In finding no prejudice, the majority opinion reasons that Wilmington could have obtained an eve-of-trial deposition, had ample opportunity for cross-examination at trial, and got the expert to lower his damage numbers.  These points, too, are amply addressed by Judge Wynn, who explains that the opportunity for cross-examination is not the same as having the knowledge and preparation time

needed to cross-examine well; an eve-of-trial deposition is no substitute for an expert report provided months in advance of trial for use in cross-examination; cross-examination does not substitute for a rebuttal expert report that the jury can review in deliberations; and the expert's reductions in his calculations reflect inflated original numbers, not what Wilmington might have achieved had Plaintiffs litigated fairly. Id. at 69-73.

The red flags raised by Judge Wynn should be heeded. This Court's full review is needed to restore the teeth to Rule 37(c)(1).

2.     The decision raises a second critical issue warranting panel or en banc rehearing. The jury found that Wilmington entered into in an oral contract to loan $5.5 million each year to an insurance trust to "overpay" for insurance premiums for three "second-to-die" life insurance policies. "Overpaying" means that the portions of the loans that exceed the costs of keeping insurance in place and paying interest and expenses would be placed in the policies for investment purposes.

Two individuals reached this oral agreement: Charles ("Charlie") Bresler, and Ed Ianni, a Wilmington official. Neither testified that their agreement required Wilmington to lend $5.5 million/year until both insureds (Charlie and Fleur Bresler) died. Charlie testified that Wilmington had agreed not to require collateral beyond the first year of insurance, but Charlie never mentioned the amount, duration, or

periodicity of Wilmington's loan commitment beyond that first year. Ianni never testified. No contemporaneous writings address the issue.

As no direct evidence exists, the panel opinion cites pre-contractual letters by Wilmington proposing to lend $5.5 million/year. But Charlie *rejected* each of these proposals, principally because Wilmington tied the loans to a collateral requirement. No evidence indicates that Wilmington agreed to lend $5.5 million/year throughout the lives of the insureds *without* this collateral.

By using rejected pre-contractual proposals to provide key terms of an oral agreement, the panel opinion conflicts with applicable Delaware law. Once Charlie rejected Wilmington's proposals, they were withdrawn as a matter of law and could not provide the basis for a subsequent acceptance. See, e.g., PAMI-LEMB I Inc. v. EMB-NHC, L.L.C., 857 A.2d 998, 1015 (Del. Ch. 2004). The panel opinion did not address this conflict. Accordingly, rehearing by the panel or the Court en banc is needed to ensure the correct application of Delaware law.

## REASONS FOR GRANTING REHEARING

**I.    The Full Court Should Decide En Banc Whether Discovery Abuse May Be Excused under Rule 37(c)(1) Merely Because the Victimized Party Had the Opportunity to Take an Eve-of-Trial Deposition and to Conduct Cross-Examination at Trial.**

The record below clearly demonstrates that Plaintiffs violated the Rules from start to finish, with "myriad violations" in their "disclosures and trial testimony" (Dissent 42) and yet incurred no sanction. See id. at 45-53 (recounting history).

Indeed, the majority opinion *agrees* that Plaintiffs repeatedly violated the rules (Majority Op. 22) yet holds that Wilmington, the victim of what Judge Wynn describes as a "miscarriage of justice" (Dissent 43), is not entitled to relief.

The applicable Rules are stringent.   Rules 26(a)(1)(A)(iii) and 26(a)(2) required Plaintiffs to disclose, no later than 90 days before trial, "a computation of each category of damages claimed," to "make available" the documents and evidence "on which each computation is based," and to "disclose [their] damages calculation within 14 days after the parties' Rule 26(f) conference."  Rule 26(a)(2) requires expert reports containing, <u>inter</u> <u>alia</u>, "a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions."  Per Rule 26(a)(2)(C), the report must be submitted "at the time and in the sequence the court orders," and, per Rule 26(a)(2)(E), it must be timely supplemented with any new facts or opinions.  As Judge Wynn painstakingly explains (Dissent 45-53), Plaintiffs blew through these Rules with impunity and misled the district court about what they had done:

- The expert report by accountant Robert Pugh merely determined the present value of $5.5 million until the anticipated death-date of the second insured, Fleur Bresler, in 2019 ($52 million).  It did not measure costs, expenses, and other variables, such as the cost of insurance ("COI") and interest on the loans, and did not calculate the net damages (the "net-in-trust" shortfall).  Pugh instead warned that he *might* later offer a net-in-trust opinion.

6

- Pugh testified at deposition that he was not a damages expert and had not assessed the variables or rendered a net-in-trust opinion.

- Expert discovery closed on October 23, 2012 without any net-in-trust opinion by Pugh.

- Wilmington's motions for summary judgment were denied in August 2013. Trial was set for December 3, 2013.

- On October 29, 2013, just *one month* before the then-scheduled trial date, just *three days* before the November 1 cut-off for pretrial motions, *two years* after the initial disclosure deadline, and *one year* after the cut-off for expert discovery, Plaintiffs filed a proposed pretrial order stating that Pugh had calculated a $42 million net-in-trust shortfall. (JA-575).

- The trial date was moved back one month. In early November, *after* Wilmington had moved <u>in</u> <u>limine</u> to bar this new opinion, Plaintiffs provided a thumb-drive with hundreds of trial exhibits. One exhibit (PX-174) contained Excel spreadsheets estimating a net-in-trust shortfall of $19.9 million, based on hypothetical COI data that Wilmington expert Kevin Stephens' hypothetical COI data provided 1½ years beforehand.

- In memoranda, pre-trial hearings, and even their appeal briefs in this Court, Plaintiffs repeatedly—and falsely—insisted that Pugh's report contained the "formula" for net-in-trust damages and that PX-174 merely "plugged in" known data. Yet at oral argument in this Court, "Plaintiffs conceded that—contrary to their repeated representations to both the district court and this Court—Pugh's report did not provide a formula for calculating the alleged net-in-trust shortfall" and so the data "could not have been 'plugged in' to any formula in his report." (Dissent 53).

- Plaintiffs' misrepresentations led the trial court to believe, mistakenly, that PX-174 was a simple illustrative exhibit of "everything [Pugh] had in his report." (JA-1393).

- At trial, Pugh changed his numbers "several times," aided by the absence of a report. (Dissent 51). His testimony zigged, repeatedly agreeing with Wilmington about his errors, and then zagged, telling Plaintiffs that he was not agreeing to those errors. (JA-2015-16, 2039-40, 2043-44). The district court halted Pugh's testimony, stating that the case was "in hopeless confusion," that the jury must be "triply confused," and that "I think [Pugh]

7

may not be able to come up with any number at all." (JA-2049-51). Over objection, Pugh was given a weekend to work with Plaintiffs' counsel to fix his opinions.

- Several days later, Pugh returned to the stand and testified to a $17.8 million net-in-trust shortfall—another new number—presenting a one-page exhibit (PX-174B) of his conclusions but none of the requirements for a report: "a complete statement of the "basis and reasons" for his opinions and "the facts or data" he "considered…in forming them." Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii).

- The jury returned a $17.8 million net-in-trust verdict in favor of Plaintiffs, exactly as provided in PX-174B.

(Dissent 45-53). Throughout all of this, one fact remained constant: Plaintiffs *never* provided an expert report with Pugh's methodology for the net-in-trust shortfall.

Given this aggravated sequence of violations and trial chaos, this should have been a textbook case for exclusion under Rule 37(c)(1) or a new trial. Under Rule 37(c)(1), "[i]f a party fails to provide information…as required by Rule 26(a) or (e), the party *is not allowed* to use that information or witness to supply evidence…at a trial, unless the failure was *substantially justified* or is *harmless*." (Emphasis added). While the district court ordinarily has broad discretion under Rule 37(c)(1), Judge Wynn explains that, "because Plaintiffs repeatedly misled, intentionally or otherwise, the district court regarding information essential to determining whether Plaintiffs complied with Rule 26 and whether any violation of Rule 26 was harmless," they "deprived the district court of the opportunity to exercise its

discretion in an informed manner[.]" Id. at 42-43. Thus, no deference is owed to the opinion of the trial court. Id. at 54-57.

Despite agreeing that Plaintiffs repeatedly violated Rule 26, the majority's ruling affirms the judgment below, holding that, although Plaintiffs' stonewalling was not justified, the violations were "harmless" under Rule 37(c)(1), one of two exceptions to mandatory exclusion. (Majority Op. 26). Per S. States Rack and Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 597 (4th Cir. 2003), substantial justification (the other exception) and harmlessness are determined by weighing five factors: (1) the surprise to the victimized party; (2) that party's ability "to cure the surprise"; (3) the extent of trial disruption; (4) the evidence's importance; and (5) the offending party's explanation. Id. The majority opinion illustrates critical problems with this test. Does "surprise" mean that the victim had no advance notice, or that the substance of the new evidence was previously unknown? What does it mean to "cure" the surprise? Does the new evidence's "importance" favor the victim or the culprit? One district court in this Circuit recently complained that the five factors "obfuscate" more than they "elucidate" because the test does not explain how these factors should be weighed. See Scraggs v. NGK Spark Plugs (U.S.A.), Inc., No. 2:15-cv-11357, 2016 WL 2952567, *3 (S.D. W. Va. May 13, 2016). Such laments confirm the need for en banc review.

The purpose of the Rules is to incentivize early and full disclosure. As Southern States explains, "The Rule 37(c) advisory committee notes emphasize that the 'automatic sanction' of exclusion 'provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence.'" 318 F.3d at 595 n.2 (quoting advisory committee notes (1993)). Thus, Rule 37(c)(1) was written broadly to establish "a baseline rule" that the "'***required sanction in the ordinary case is mandatory preclusion***.'" Santiago-Diaz v. Laboratorio Clinico Y de Referencia del Este, 456 F.3d 272, 276 (1st Cir. 2006) (emphasis added, citation omitted).

This pro-exclusion thrust means that the "harmless" exception must be narrowly construed and applied. Indeed, in the Sixth Circuit, a violation is "harmless" only if (1) it involves an "honest mistake," *and* (2) the victimized party had "sufficient knowledge" of the expert opinions. Sommer v. Davis, 317 F.3d 686, 692 (6th Cir. 2003) (discussing the advisory committee note). The advisory committee notes provide this example: an "'inadvertent omission from a Rule 26(a)(1)(A) disclosure of the name of a potential witness known to all parties[.]'" Newman v. GHS Osteopathic, Inc., 60 F.3d 153, 156 (3d Cir. 1995). To avoid exclusion, the violation thus must be relatively innocuous, causing only de minimis prejudice: "Harmlessness, however, is the key under Rule 37, not prejudice." Sommer, 317 F.3d at 692.

10

The majority opinion, by contrast, applies a standard closer to material prejudice, looking in hindsight to whether timely disclosure would have led to a different result, and requiring Wilmington, not Plaintiffs, to prove this prejudice. It found that Wilmington was not "surprised" (factor 1) because Pugh's report cryptically mentioned that he *might* offer a net-in-trust opinion in the future. (Maj. Op. 23). But it is always true that an expert might provide a new opinion in the future; what the expert says in it is what constitutes the surprise.

Next, the majority found that Wilmington had full opportunity to "cure" any surprise (factor 2) by re-deposing Pugh and cross-examining him at trial, that its defense would not have changed had no violations occurred, and, for similar reasons, that the violations did not "disrupt" the proceedings (factor 3). Id. at 24. In effect, the majority looked at the outcome and determined that Wilmington would not have done better with Pugh had Plaintiffs obeyed the Rules: no ultimate harm, so no material foul. This is pure speculation. It is impossible to conclude here what would have happened had the Rules been followed, and Rule 37 does not permit such clairvoyance.

Finally, the majority found that, because Pugh's numbers fell as his errors were exposed, Wilmington could not have been prejudiced. Id. But Pugh's changes correcting his errors ultimately enhanced his credibility to the jury. Pugh's final

opinion still contained numerous additional errors that Wilmington tried unsuccessfully to explain to the jury.

The majority's analysis ignores the abject unfairness and tumult caused by Plaintiffs' sandbagging, the incredible chaos at trial, and, most importantly, the fact that Plaintiffs *never* produced a compliant expert report (let alone data and methodology for Pugh's final revised conclusions) with which Pugh could be cross-examined. Until this decision, this Court has considered such violations to be "far from harmless":

> Appellant's initial disclosure failed to provide Appellee with any concrete explanation of Dr. Voskanian's potential testimony. The disclosure was made *after* the agreed-upon expert disclosure date, *after* discovery was closed, *after* Appellee filed a motion for summary judgment, and on the very date set by the court for the filing of motions to exclude experts. ***It is hard to accept that these events would not serve as a surprise to Appellee, or that Appellee could easily cure such a surprise***.

Wilkins v. Montgomery, 751 F.3d 214, 223 (4th Cir. 2014) (emphasis added).

Accord Saudi v. Northrop Grumman Corp., 427 F.3d 271, 278 (4th Cir. 2005) ("A party that fails to provide these disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case."). Given Plaintiffs' misrepresentations to the district court and their additional violations at trial, Plaintiffs' gamesmanship here is more egregious than in Wilkins.

Under the majority's approach, discovery misconduct would hardly ever warrant Rule 37(c)(1) sanctions. Some redress always is possible—e.g., reopening discovery, allowing eve-of-trial depositions, revising schedules, granting continuances. Such limited remedies may help mitigate some of the harm, but they do not render serial violations and misrepresentations *harmless*. Indeed, it is difficult to see what would constitute cognizable "harm" under this standard. The majority opinion allows trial courts to use the five-factor Southern States test to excuse blatant violations of Rule 26, contrary to prior Circuit precedent.

In any event, Wilmington *did* experience acute prejudice, as Judge Wynn explains: "Plaintiffs' noncompliance with Rule 26 deprived [Wilmington] of the opportunity to depose Pugh with the benefit of his net-in-trust damages opinion, prepare a rebuttal report responding to Pugh's opinion, and to develop counter-testimony" through its "own experts." (Dissent 43, 72). As to the offer of an eve-of-trial deposition, Rule 26(b)(4)(A) *prohibits* depositions of experts until a compliant report is provided in order to ensure that opposing counsel has "notice" as "to what the expert witness will testify" to "*before the deposition*" is taken. Id. (emphasis in original, internal quotation marks omitted). The Rules themselves thus establish that an eve-of-trial deposition does not "cure" these violations.

Concealing an expert opinion until the eve of trial and even allowing never disclosed, new opinions during the trial, is inherently disruptive. For example, the

13

majority opinion finds that Wilmington failed to raise timely at least two issues relating to Pugh's opinion: the lack of any present or inevitable future injury to Plaintiffs at the time of trial, as shown by Pugh's own spreadsheets, and Pugh's use of social security mortality tables to supply the likely future date of death for Fleur Bresler, contrary to decisions by the Supreme Court, N.Y. Life Ins. Co. v. Viglas, 297 U.S. 672, 678-81 (1936), and Learned Hand, In re New York, N.H, & H.R. Co., 92 F.2d 428 (2d Cir. 1937), regarding the calculation of damages in cases like this. See Maj. Op. 36 n.21, 37 n.22. If these issues were not sufficiently preserved, that is the direct consequence of concealing key expert testimony on damages/injury until trial and the inevitable disruption in trial preparation and management that ensued.

The sandbagging also succeeded in one other crucial respect. Because Wilmington could not have known that Pugh would misuse the hypothetical COI examples in Stephens' report as actual measures of COI, in lieu of obtaining the actual COI data directly from the insurers, it lost the opportunity for third-party discovery from the insurers to obtain definitive, indisputable COI numbers that Pugh would have *had* to use. Using actual COI data would have decreased Pugh's final calculation by millions of dollars.

Wilmington thus suffered tremendous harm as the result of Plaintiffs' continuous violations. For these reasons, and for those issues addressed by Judge Wynn in his dissent, the full Court should review this case.

II.    **The Court Should Rehear Its Ruling that Plaintiffs Produced Sufficient Evidence of an Oral Agreement by Wilmington to Loan $5.5 Million Annually, without Requiring Collateral.**

Panel or en banc rehearing also is needed for the panel's decision affirming the judgment that Wilmington entered into and breached an oral contract to loan $5.5 million each year to an insurance trust to "overpay" premiums for three "second-to-die" life insurance policies.

In January 2004, following months of failed negotiations, Charlie Bresler and Ed Ianni, a former Wilmington official, reached an oral agreement on the terms for a "premium financing life insurance" agreement whereby Charlie and Fleur would purchase three second-to-die life insurance policies financed with loans by Wilmington. Portions of this agreement were reduced to writing, but the broader terms were neither written nor addressed in any contemporaneous document.

Only two individuals, Charlie and Ianni, had personal knowledge of this oral agreement. Neither testified that Wilmington was obligated to lend $5.5 million annually until both insureds died. Charlie testified by deposition that Wilmington had agreed not to require collateral beyond the first year of insurance, but he did not address Wilmington's ongoing lending commitment. Ianni did not testify. This claim, which accounts for 80% of the damages award, thus has no direct evidence in support.

The panel opinion cites pre-contractual letters by Wilmington proposing to lend $5.5 million/year. Wilmington made clear that these loans were subject to collateral requirements, and so Charlie *rejected* these proposals. (JA-1517-21, 1811-12, 1820-21, 1825, 1833, 1839-40, 1843, 1865). None of these proposals suggests that Wilmington was willing to lend $5.5 million/year throughout Charlie and Fleur's lives *without* this collateral. Delaware is crystal-clear: once a proposal is met by a response with different terms, it is rejected and withdrawn. See, e.g., PAMI-LEMB I Inc. v. EMB-NHC, L.L.C., 857 A.2d 998, 1015 (Del. Ch. 2004) ("A response to an offer that is not on the terms set forth by the offeror constitutes a rejection of the original offer and a counteroffer."). Thus, the panel opinion misapplies Delaware law.

The opinion also cites a post-contractual February 2005 proposal by Wilmington, but it merely offered a loan to pay second-year premiums *if* Charlie pledged $2 million in collateral. (JA-2758-59). Plaintiffs never protested Wilmington's failure to make these annual loans until 6½ years later, nearly 1½ years after they filed suit. Under Delaware law, this course-of-conduct acquiescence should have received "great weight" and not have been ignored. See Artesian Water Co. v. State Dept. of Highways & Transp., 330 A.2d 441, 443 (Del. 1974); Radio Corp. of Am. v. Philadelphia Storage Battery Co., 6 A.2d 329, 340 (Del. 1939).

16

Either the panel or Court sitting en banc should rehear this issie to determine the correct application of Delaware law.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should rehear the case en banc, or, in the alternative, the panel should rehear the case in part, as discussed above.

Dated:  May 4, 2016

Respectfully submitted,

<u>/s/ *James L. Shea*</u>
James L. Shea
Mitchell Y. Mirviss
Christopher S. Gunderson
Venable LLP
750 East Pratt Street, 9th Floor
Baltimore, MD 21202
410-244-7400

David T. Case
Stavroula E. Lambrakopoulos
K&L Gates LLP
1601 K Street, N.W.
Washington, D.C. 20036
202-778-9000

Attorneys for Wilmington Trust
Company

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**
**Effective 12/01/2016**

No. __15-2086__    **Caption:** Fleur S. Bresler, et al. v. Wilmington Trust Company

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

---

**Type-Volume Limit for Briefs:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

---

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

---

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

---

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✔] this brief or other document contains ____3,892____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✔] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word_____ [*identify word processing program*] in
14-point Times New Roman_____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Mitchell Y. Mirviss_____

Party Name Wilmington Trust Company_____

Dated: May 4, 2017_____

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 4th day of May 2017 that the foregoing

Petition for Rehearing of Appellant Wilmington Trust Company was served on

counsel of record for Appellees Fleur S. Bresler, et al, through the CM/ECF

system, which will send out an electronic copy of the brief to counsel as registered

users.

Date: May 4, 2017                    /s/ *Mitchell Y. Mirviss*
                                     Mitchell Y. Mirviss